IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED
9/13/2024
LAURA A. AUSTIN, CLERK
BY: s/c Kemp
DEPUTY CLERK

| | | |
|---|---|---|
| BENJAMIN DAVID AYERS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:23-cv-00419 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| WAL-MART ASSOCIATES, INC., | ) | By:  Hon. Thomas T. Cullen |
| | ) |     United States District Judge |
| Defendant. | ) | |

Plaintiff Benjamin Ayers ("Ayers") brought this action against his former employer, Defendant Wal-Mart Associates, Inc. ("Walmart"), alleging nine causes of action related to his employment and eventual termination: (1) retaliation under the Virginia Whistleblower Protection Law ("VWPL"); (2) disability discrimination under the Americans with Disabilities Act ("ADA"); (3) retaliation under the ADA; (4) failure to accommodate under the ADA; (5) interference under the ADA; (6) discrimination on the basis of sex or sexual orientation under Title VII of the Civil Rights Act ("Title VII"); (7) retaliation under Title VII; (8) discrimination under the Virginia Human Rights Act ("VHRA"); and (9) retaliation under the VHRA. Because of the overlapping standards for many of these causes of action, the court analyzes Ayers's claims in the following groups: (A) VWPL claim, (B) discrimination claims, (C) retaliation claims, (D) failure-to-accommodate claim, and (E) interference claim.

This matter is before the court on Walmart's motion for summary judgment. (ECF No. 25.) The motion has been fully briefed by the parties and the court heard argument on the motion on August 28, 2024. For the reasons discussed below, the court will deny Walmart's motion for summary judgment.

## I.   STATEMENT OF FACTS

The following facts are either undisputed or presented in the light most favorable to Ayers, the nonmoving party. *See Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013).

In late August 2020, Walmart hired Benjamin Ayers as a Cashier/Front-End Associate at the Walmart Supercenter in Galax, Virginia. (Dep. of Benjamin Ayers, Jan. 29, 2024 31:19–32:3 [ECF No. 31-1].) At the time he was hired, Ayers, who identifies as gay, had been in a committed same-sex relationship for some time. (*See id.* at 14:14–17.) Ayers also struggled with some physical and mental disabilities. (*See id.* at 23–25; ECF No. 31-2; ECF No. 31-3.)

Before he began working at Walmart, Ayers worked for Vaughan-Bassett, a wood-furniture company, and sustained a serious arm injury while repairing a conveyor belt at their factory. (Ayers Dep. at 17:11–18:1, 19:11–20:14.) Ayers sought medical treatment following this event and was diagnosed with a crush injury of the upper arm. (*See id.* at 20:15–21:4; ECF No. 31-26.) For treatment, Ayers attended physical therapy for one week and regained a significant degree of mobility in his arm, though some side effects of the injury remain, including that, according to Ayers, it hurts more when the temperature changes or it rains. (Ayers Dep. at 21:8–22:2, 54:8–12.)

Ayers also has post-traumatic stress disorder ("PTSD") and Asperger's syndrome, a form of autism. Ayers's PTSD apparently stems from the same factory accident, which he contends also caused insomnia and anxiety. (*See* Psychotherapy Progress Note, at 2 [ECF No. 31-24].)

During his Walmart orientation, Ayers received and read Walmart's policy on disability accommodations, asked a human resources ("HR") representative whether he needed to

complete any paperwork regarding accommodations for his disabilities, and gave HR a note from his therapist stating that he had Asperger's.[1] (Ayers Dep. at 58:15–59:18.) The HR representative told Ayers that he "didn't have to worry about" completing any paperwork and that she would note his Asperger's in his file. (*Id.* at 59:6–18.) Ayers also mentioned his disabilities to Cynthia Poe, his new supervisor, and spoke about them with several other co-workers and Team Leads. (*See, e.g., id.* at 47:4–48:19, 77:13–18; Dep. of Cynthia Poe 89:19–20, Mar. 12, 2023 [ECF No. 31-13].) According to Ayers, Walmart began accommodating his disabilities (e.g., not assigning him to Register 3 after an incident involving the conveyor belt and his PTSD) without formal, written requests or any indication there would be an issue. (*See* Ayers Dep. at 48:20–49:11, 96:6–97:2.)

Ayers did not have an unblemished employment record. Walmart disciplined him for the first time on October 19, 2021, when Poe issued Ayers a "yellow coaching" related to two incidents. (*See* Decl. of Cynthia Poe Ex. 1 ("Poe Decl.") [ECF No. 26-3].) In one incident, a newly hired associate quit at lunch because Ayers made a rude comment about her inexperience. (*See* Ayers Dep. at 67:10–20; Poe Dep. at 121:21–122:1.) In the other incident, Ayers asked Team Lead Sharita Sizemore whether she was married or had a wife; Ayers apparently heard a rumor from another co-worker, Stacy Costa, that Sizemore was gay. (*See*

---

[1] There is a dispute about when Ayers was officially diagnosed with Asperger's. Ayers claims it was prior to his hiring, whereas Walmart contends that no official diagnosis is on file with a medical doctor until November 2021. Nonetheless, the date of the diagnosis is ultimately irrelevant. The definition of "disability" under the ADA is broad and does not turn on an official diagnosis alone. *See, e.g., Hughley v. Sw. Airlines*, No. SAG-23-02980, 2024 WL 1676729, at *5 (D. Md. Apr. 18, 2024) (diagnosis alone not necessarily sufficient to prove a "disability" under the ADA); *Bostick v. Cabarrus Cnty. Dep't of Health and Human Servs.*, No. 1:18-cv-1042, 2022 WL 1686903, at *9 (M.D.N.C. May 26, 2022) (undiagnosed claustrophobia enough to trigger duty to engage in accommodation process). Ayers sufficiently describes his mental disabilities to qualify under the ADA, and any dispute lies in whether Ayers properly requested an accommodation or notified Walmart of his disability.

Ayers Dep. at 65:5–66:8; Dep. of Sharita Sizemore 18:1–13, Mar. 14, 2024 [ECF No. 31-8].) After the encounter, Sizemore spoke with Poe and told her that Ayers's questions and comments had "bother[ed]" her, but that she "didn't want anything done about it." (Sizemore Dep. at 16:7–15.) Poe then contacted the Walmart Ethics Helpline to report the incident, noting that store manager Todd Taylor "advised her to give them a yellow coaching for harassment," and that Ayers stated he "didn't mean any harm" and "will be more mindful" in the future. (Poe Ethics Report, at 2 [ECF No. 31-19]; Poe Decl. at 8.) While Ayers was disciplined for his actions, Costa was not disciplined for spreading the rumor. (Poe Dep. at 56:16–21.)

The next day, Ayers spoke to Assistant Store Manager Cheryl Craft about Poe. (Ayers Dep. at 75:12–18.) Poe was also present during Ayers's meeting with Craft. (Dep. of Cheryl Craft 15:4–10, Mar. 12, 2023 [ECF No. 31-5].) During this meeting, Ayers complained about how Poe treated him, saying that she "disregarded [his] disabilities." (Ayers Dep. at 77:1–5.) He also gave Poe and Craft printed articles from the internet about Asperger's syndrome, and the three discussed the topic. (*See* Ayers Dep. at 78:10–21; Craft Dep. at 15:16–17; Poe Dep. at 17:5–21.) Apart from having an apparently cordial conversation, Poe did not request medical documentation from Ayers at that time or seek subsequent guidance from any other department at Walmart regarding his apparent disability. (Poe Dep. at 18:2–19:12, 87:9–88:12.)

In that same meeting or soon thereafter, Ayers spoke with Craft and Poe about transferring to another position within Walmart, like online grocery. (Craft Dep. at 18:2–6; Poe Dep. at 40:19–41:6; Ayers Dep. at 149–150.) Ayers said that he wanted a transfer to reduce customer interaction and the need to deal with many social cues. (Ayers Dep. at 149:17,

150:20–151:2; Poe Dep. at 40–41.) Poe requested that Ayers continue to work as a cashier through the holiday season, but alerted the online-grocery manager of Ayers's interest in that department. (Ayers Dep. at 150:1–4; Poe Dep. at 41:7–9; *see* Dep. of Todd Taylor 17:4–24, Mar. 13, 2023 [ECF No. 31-11].) Walmart's policy required that Ayers's former position be filled before a transfer to a different department could occur. (*See* Craft Dep. at 19:10–16.) But Poe did not take any steps to hire a replacement cashier, even though the store regularly had other positions become available. (Poe Dep. at 43; *see* Craft Dep. at 18:5–14.) After some time, the online-grocery position was filled, and Ayers remained as a cashier. (Ayers Dep. at 150:5–7.)

Six months later, in April 2022, Poe disciplined Ayers for repeatedly asking a fellow employee, Brandi Anders, if her minor brother, fellow employee Brian Anders, was gay. (*See* Ayers Dep. at 70:11–73:4; Poe Decl. at 5.) While Ayers maintains that his questions were innocent inquiries, Brandi and Brian Anders felt uncomfortable with them and reported Ayers's conduct to Poe. (Dep. of Brian Anders 13:11–14:3, 23:10–22, Mar. 14, 2024 [ECF No. 31-12].) As a result of Brian Anders's complaint, Poe again reported Ayers's conduct to Walmart Ethics, which instructed her to perform a more severe "red level" coaching. (*See* Poe Decl. at 5.)

During the coaching meeting, Poe admonished Ayers "not to ask or speak of someone's sexual orientation" and to focus on his job. (*Id.* at 7.) Ayers again agreed to be more "mindful" in the future, but also confronted Poe about whether she would write up numerous other employees, including herself, for asking Ayers questions about his own life or sexual orientation. (*Id.* at 8; Ayers Dep. at 73:9–14.) Although she indicated she would, Poe did not

pursue any disciplinary action against others; in her view, Ayers's situation was different because he made his sexuality publicly known throughout the store. (Poe Dep. at 94.)

A few months later, in late June or early July 2022, Ayers and Poe had yet another tense encounter. Three days after witnessing Ayers interact with children in the store, Poe warned him that he should remain focused on his job and not interact with any children because parents "may not want you holding or touching their kids." (Ayers Dep. at 80:10–82:4.) According to Ayers, Poe also commented that his behavior could be viewed as "sexual harassment," to which Ayers took offense. (*See id.*) Ayers claims that no other employees were reprimanded for interacting with children. (*see* Ayers Dep. at 81:14–20; Pl.'s Br. Opp. Ex. 16 ("Ethics Email") [ECF No. 31-16].) Poe stated that, if any other employees were reprimanded, it was for the same reason Ayers was reprimanded: to keep employees focused on their jobs. (Poe Dep. at 80:12–21.)

Following this, Ayers felt compelled to file a written complaint against Poe to Walmart Global Ethics. On July 13, 2024,[2] Ayers sent an email to Walmart Global Ethics after attempting to submit a similar complaint to the online ethics portal. (*see* Ethics Email; Pl.'s Br. Opp. Ex. 29 ("Online Portal Complaints") [ECF No. 31-29].) In his email, Ayers laid out a lengthy complaint detailing "acts of discrimination" related to his "disabilities and sexual orientation from [his] Store Coach Cynthia Poe." (Ethics Email.) The complaint included descriptions of Ayers telling Poe about his disabilities, requesting accommodations, reporting Poe's mishandling of his disabilities, and his accounts of the situations leading to the

---

[2] For clarity, it appears from the time stamps on his various complaints that Ayers began to report his complaints through the portal on the night of July 12 (around 9:30 p.m.) and continued into the very early morning hours of July 13 (at least 2:40 a.m.). The court will use the operative date as July 13 for simplicity.

disciplinary actions. (*Id.*) Later that month, Ayers submitted another complaint through the online ethics portal, again alleging discriminatory or retaliatory actions. (*See* Online Portal Complaints.) Sometime after he submitted his complaints, Ayers says he and several associates overheard Craft and Poe discussing Ayers's reports against her. (Ayers Dep. at 99:22–101:3.)

On August 9, 2022, the long-running conflict between Ayers and Poe finally came to a head. Ayers was working in the self-checkout when one of the supervisors asked him to go outside and push carts. (Ayers Dep at 85:9–13.) Ayers went out to the parking lot, grabbed about seven carts by hand, pushed them in, and went back to his position at the registers. (*Id.* at 85:16–21.) Ayers was again told to go outside and continue pushing carts. (*Id.* at 85:21– 86:1.) He returned to the parking lot, this time in search of a cart mule to help push the carts, but couldn't find a free, working mule, so Ayers again returned to his post. (*Id.* at 86:3–8.) Within minutes, Poe and Dix called Ayers into the cash office to discuss why he was not pushing the carts as asked. (*Id.* at 86:12–14; Poe Dep. at 102:21–23.) Ayers told Poe that he was not dressed properly and that a cart mule was not available. (Ayers Dep. at 86: 14–15.) Poe offered him a pair of shorts, but Ayers insisted that he still could not push carts without a mule. (*Id.* at 86:16–18.)

At this point, a back-and-forth ensued where Ayers told Poe that he had a medical condition since "his elbow had been crushed and he had told her that previously." (Pl.'s Br. Opp. Ex. 17 ("Dix Statement") [ECF No. 31-17]; Ayers Dep. at 86:22.) In response, Poe asked Ayers if he had a doctor's note. (Ayers Dep. at 87:1; Dix Statement; Poe Dep. at 102:17–20.) Ayers said he did not have a note on hand, but he could get one. (Ayers Dep. at 87:1–3; Dix Statement; Poe Dep. at 103:3–5.) Poe insisted that, unless a note was on file already, Ayers

would need to go out and push the carts until he got a note; Ayers refused. (Ayers Dep. at 87:4–7; Dix Statement; Poe Dep. at 102:17–20.) Poe then asked for his badge, which Ayers handed over, and told him she was terminating him. (Ayers Dep. at 87:8–9; Dix Statement.) Upset, Ayers said, "Fuck you, bitch," and slung his work vest toward her, hitting her in the face. (Ayers Dep. at 87:14, 93:2–4; Dix Statement.)[3]

On September 27, 2022, Ayers filed a complaint with the Virginia Office of Civil Rights ("VOCR") and the Equal Employment Opportunity Commission ("EEOC"). (Compl. ¶ 8 [ECF No. 1].) Ayers received his Notice of Right to Sue from the EEOC on April 12, 2023, and from VOCR on April 14, 2023. Ayers subsequently filed this action on July 10, 2023.

## II.   STANDARD OF REVIEW

Under Rule 56(a), the court can only "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn*, 710 F.3d at 213. When making this determination, the court considers "the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322 (quoting Fed. R. Civ. P. 56(c)). Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* The moving party bears the initial burden

---

[3] Ayers filed a final complaint on the online ethics portal after his termination, telling his story of the incident soon thereafter.

of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If that burden has been met, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Glynn*, 710 F.3d at 213. Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [his] favor.'" *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. The nonmoving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252). It may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *See Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874–75 (4th Cir. 1992). To grant summary judgment, "the court must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248).

### III.   ANALYSIS

### A.  Count I: VWPL Retaliation Claim

Virginia Code § 40.1-27.3(A)(1) provides that "[a]n employer shall not discharge, discipline . . . or take other retaliatory action regarding an employee's compensation, terms, conditions, location, or privileges of employment, because the employee . . . in good faith reports a violation of any federal or state law . . . to a supervisor . . . ." Va. Code Ann. § 40.1-27.3(A)(1) ("VWPL"). To establish a claim under the VWPL, Ayers must establish that: "(1) he made a good faith report of a federal or state violation to a supervisor, (2) was discharged [or disciplined] by his employer, and (3) his report was the 'but for' cause of his discharge." *Workman v. LHC Group, Inc.*, No. 1:23-cv-048, 2024 WL 3572305, at *3 (W.D. Va. July 29, 2024) (quoting *Moore v. Cooper River Shared Servs., LLC*, No. CL-2023-9565, 2024 WL 366099, at *9 (Va. Cir. Ct. Jan. 30, 2024)) (cleaned up). To succeed on his claim, a plaintiff "need only prove that he opposed an unlawful employment practice which he reasonably believed had occurred or was occurring." *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003) (cleaned up). As this court has noted, when a complaint of alleged discrimination is "self-evidently a complaint about a violation of federal law," a plaintiff does not need to specifically identify some specific violation of law to state a claim under the VWPL. *Hariston v. Nilit Am., Inc.*, No. 4:23-cv-00011, 2023 WL 5447370, at *6 n.6 (W.D. Va. Aug. 24, 2023).

In this case, the parties do not dispute that Walmart disciplined and terminated Ayers. Walmart argues that Ayers's claim fails on multiple fronts because there is no evidence that (i) any of his complaints sufficiently identify a violation of federal or state law, (ii) the Walmart Ethics hotline does not qualify as a "supervisor," and (iii) Poe did not know of any reports,

meaning Ayers cannot establish that they were a cause of her taking adverse action against him.

First, taking the evidence in the light most favorable to Ayers, the court concludes that his complaints of discrimination were relatively specific, and "self-evidently" complaints about violations of federal and state law. Ayers's complaints regarding the alleged incidents of discrimination were brought to the attention of Craft, submitted to Walmart Ethics in his email of July 13, 2022 (*see* Ethics Email), and submitted through the online portal at least once prior to his termination. (*See* Online Portal Complaints.)

Second, Walmart's policy directs employees to report any violative conduct to a salaried member of management *or* to the Global Ethics Office. (Pl.'s Br. Opp. Ex. 30 ("Reporting Procedures") [ECF No. 31-30].) Since Walmart, by its policies, made the Ethics Office an appropriate place to report on equal footing with management, and because Ayers made at least one report to Craft, a salaried manager, Ayers's reports of wrongdoing sufficiently qualify as being made to a "supervisor." *Cf. Alexander v. City of Chesapeake*, No. CL21-0013, 2021 WL 8775735, at *2 (Va. Cir. Ct. May 20, 2021) (finding that agency principles apply to impute knowledge to a government body under VWPL).[4] If the court were to accept Walmart's argument, an employer could immunize themselves against liability under the VWPL by adopting policies that direct to employees to lodge complaints with an ethics hotline or office, then claim in court that, because the "Ethics Officer" was not a supervisor, there can be no

---

[4] Walmart argues that this case is inapplicable because it only addresses the Fraud and Abuse Whistleblower Protection Act, Va. Code Ann. § 2.2-3009, *et seq.*, and not the VWPL. This is not correct, as the circuit court explained its reasoning "under either statute." *Alexander*, 2021 WL 8775735, at *2.

claim under the VWPL. That is not the law, and the court will not countenance such implied immunity.

Finally, Ayers has pointed to evidence that Poe knew about his complaints of discrimination and was discussing those reports with Craft in the days before she fired Ayers. (*See* Ayers Dep. at 99:22–101:3.) Accordingly, for purposes of summary judgment, Ayers has sufficient evidence for a reasonable jury to conclude he was retaliated against in violation of the VWPL. There is, therefore, a genuine dispute of material fact, and the court will deny Walmart's motion for summary judgment on Count I.

## B. Discrimination Claims—Count II: ADA; Count VI: Title VII; Count VIII: VHRA

Ayers asserts several claims alleging that Walmart discriminated against him on the basis of his sexual orientation and his disabilities, in violation of the ADA, Title VII, and the VHRA. Claims of discrimination can be proven through direct evidence or through the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See Washington v. Offender Aid and Restoration of Charlottesville-Albemarle, Inc.*, 677 F. Supp. 3d 383, 396 (W.D. Va. 2023) (applying framework to discrimination claims under Title VII, the ADA, and the VHRA); *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 572 (4th Cir. 2015) (applying framework to ADA discrimination claims); *Albit v. Cent. Intel. Agency*, 848 F.3d 305, 315 (4th Cir. 2017) (applying framework to Title VII discrimination claims). To prevail under the *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case of discrimination under the statute; if he does so, the burden shifts to the defendant to show a legitimate, non-discriminatory reason for the adverse action; and if such a legitimate reason is shown, the burden returns to the plaintiff to prove that the defendant's reason is a pretext for

discrimination. *See Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 725–26 (4th Cir. 2019); *Jacobs*, 780 F.3d at 575–76; *Sarco v. 5 Star Fin., LLC*, No. 5:19-cv-00086, 2022 WL 883936, at *5 (W.D. Va. Mar. 24, 2022). The court will address each claim of discrimination in turn.

### 1. Count II: ADA Discrimination

To establish a claim of disability discrimination under the ADA, Ayers must prove "(1) that he has a disability, (2) that he is a qualified individual for the employment in question, and (3) that his employer discharged him or took other adverse employment action because of his disability." *Moss v. Saja Rest. Grp., LLC*, 670 F. Supp. 3d 349, 358 (W.D. Va. 2023) (cleaned up) (citing *Jacobs*, 780 F.3d at 572).[5] Although the parties dispute the timing of some of Ayers's diagnoses, they do not dispute that Ayers's physical and mental conditions qualify as "disabilities" under the ADA. And for good reason: the ADA's definition is intended to be broad, and physical conditions as well as mental conditions such as PTSD, anxiety, or autism qualify as disabilities. *See Jacobs*, 780 F.3d at 572–73. Therefore, the court will focus on the second and third elements of the *prima facie* case.

### i. Legitimate Expectations as a Qualified Individual for his Position

The second element of the *prima facie* case requires Ayers to show that he was a qualified individual for the employment in question. Walmart argues that Ayers was not meeting its legitimate expectations at the time of his termination, citing Ayers's disciplinary record. Ayers

---

[5] This reflects the proper legal test for a general claim of discrimination under the ADA. Walmart's briefing cites to a slightly different four-part test purporting to list the elements for a claim of disability or sexual-orientation discrimination. (*See* Def.'s Br. at 14 [ECF No. 26].) While similar facts will have to be proven for both disability and sexual-orientation discrimination, the applicable tests differ slightly. *See, e.g.*, *Washington*, 677 F. Supp. 3d at 396 n.8 (noting the different tests for a *prima facie* case of discrimination under the ADA and Title VII). For clarity, the court will therefore address them separately.

responds that meeting expectations "does not require the plaintiff to show that he was a perfect or model employee. Rather, a plaintiff must show only that he was qualified for the job and that he was meeting his employer's legitimate expectations." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019). Ayers argues, in part, that evidence showing that other employees were not disciplined for the same or similar conduct means that the disciplinary action Walmart is relying on to bolster its case is itself suspect and discriminatory. Therefore, he asserts, whether he was meeting Walmart's *legitimate* expectations is a disputed question of material fact that precludes summary judgment. (Pl.'s Br. Opp. at 18.)

Ayers has the better argument at this stage. There is enough evidence in the record, including the job description of Ayers's position and testimony regarding his disciplinary actions, for a reasonable jury to conclude that Ayers was, in fact, qualified for his job and meeting Walmart's expectations related to his position at that time.

## ii. Causation

Walmart next argues that Ayers cannot prove causation because there is no evidence to support that Poe knew of Ayers's disability when she fired him. Ayers contends that Poe was aware because, as he testified, he had brought up his arm injury, PTSD, and autism with her on multiple different occasions. Moreover, he contends, the testimony of other employees supports that Poe knew about Ayers's disabilities and related difficulties at work. Finally, he maintains that detailed testimony describes how he initiated a request for an accommodation by reminding Poe of his arm injury and telling her it was impeding his ability to do what she asked, and that Poe briefly engaged with him by asking for medical documentation immediately before she terminated him.

Ayers's sworn account is sufficient to defeat summary judgment. Drawing all reasonable inferences in Ayers's favor, there is a dispute of fact about whether Poe knew Ayers had a disability, and whether she terminated him because of that disability.

### iii. *McDonnell Douglas* Framework

Under the *McDonnell Douglas* framework, because the evidence could establish a *prima facie* case of discrimination, the burden shifts to Walmart to produce evidence of a legitimate, nondiscriminatory reason for taking adverse action against Ayers. Walmart asserts that Ayers was terminated for insubordination. (Def.'s Br. at 16.) With this reason, along with the harassment concerns raised by management in Ayers's prior disciplinary actions, Walmart has satisfied its burden.

The burden therefore shifts back to Ayers to proffer evidence to prove that the asserted justification is pretextual. *See Jacobs*, 780 F.3d at 575–76. Ayers argues that there is sufficient evidence of pretext because Walmart's actions were inconsistent, and Walmart's reasoning violated its own policies. For one, Poe conceded that there was another employee who could not push carts because of a medical condition related to his blood pressure, and in that employee's case, she requested medical documentation and allowed the employee time to comply. (*See* Poe Dep. at 50.) Further, Poe's testimony suggests that she was not fully transparent in her initial explanation of the incident to store manager Todd Taylor, noting that she did not mention any discussion of a medical need or accommodation request to him then. (Poe Dep. at 111–112; *see also* Taylor Dep. at 52:16–53:2.) Finally, Walmart's policy allows for

accommodation requests at any time and further provides for an interactive process,[6] instead of immediate termination. (*See* Pl.'s Br. Opp. Ex. 20 ("Accommodation Policy") [ECF No. 31-20].) Therefore, there is ample evidence to survive summary judgment at this stage. Accordingly, the court will deny Walmart's motion on Count II.

### 2.  Count VI: Title VII Discrimination

In Count VI, Ayers alleges that Walmart discriminated against him because of his sexual orientation, in violation of Title VII. Under Title VII, it is unlawful "for an employer to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1); *see Bostock v. Clayton County*, 590 U.S. 644 (2020) (discrimination because of sex encompasses sexual orientation). Specifically, Ayers alleges that he was treated differently because he is gay, resulting in his termination. (Compl. ¶ 99.) To survive summary judgment on this claim, Ayers must satisfy either a but-for causation or the *McDonnell Douglas* test.

### i.  But-for Causation

To prevail under the traditional standard, Ayers must offer sufficient direct or circumstantial evidence for a reasonable jury to find that his sexual orientation was a but-for cause of the decision to terminate him. *See Bostock*, 590 U.S. at 656. Events may have multiple

---

[6] An "interactive process" is "a means for determining what reasonable accommodations are available to allow a disabled individual to perform the essential job functions of the position." *Wilson*, 717 F.3d at 347. The process involves "an informal dialogue between the employee and the employer" to discuss the employee's issues and potential reasonable accommodations. *Allen v. City of Raleigh*, 140 F. Supp. 3d 470, 483 (E.D.N.C. 2015). Such a process requires "bilateral cooperation, open communication, and good faith." *Id.*

but-for causes, and Congress did not intend to narrowly limit Title VII's causation standard.[7] *See id.* at 656–57 ("[A] defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision."). But Ayers does not offer any direct evidence that his sexual orientation played a part in his termination. In fact, no evidence in the record supports that Ayers's sexual orientation was explicitly at issue when he was terminated. Likewise, Ayers has not cited to any circumstantial evidence that such a discriminatory motive was a motivating or determining factor in his termination. *Cf. Sarco*, 2022 WL 883936, at \*9 (granting summary judgment for the defendant when there was no evidence that discrimination was the determining factor in the plaintiff's termination, even though a reasonable juror could agree that the supervisors' comments reflected a discriminatory belief and attitude toward gay people). Absent direct or circumstantial evidence that Ayers's sexual orientation actually caused Walmart to terminate him, Ayers cannot survive summary judgment on this claim under this test.

### ii.   *McDonnell Douglas* Framework

The court next must examine if Ayers's claim survives under *McDonnell Douglas*. The elements of a *prima facie* case of discrimination under Title VII are: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). The parties do not dispute that Ayers is in a same-sex relationship and that he was terminated from his position at Walmart. Therefore,

---

[7] Congress even expanded Title VII in 1991 to allow a plaintiff to prevail merely by showing that a protected trait such as sex was a "motivating factor" for the decision. *See id.* at 657; 42 U.S.C. § 2000e-2(m).

the court need only examine the second and fourth elements. As with Ayers's ADA claim, the parties dispute whether Ayers had satisfactory job performance and was meeting the expectations of Walmart, the second element. (*See supra* § B.1.i.) On the fourth element, Ayers contends that he was treated differently, and less favorably, than similarly situated employees, and Walmart disagrees.

In support of his claim, Ayers points to Josie Stewart's testimony that he was, generally, treated "unfairly" at Walmart. (Dep. of Josie Stewart 13:19–20, Mar. 13, 2023 [ECF No. 31-9].) Macey Alderman also observed that the way Poe treated Ayers "appeared to be different" than others, "[p]articularly when interacting with children." (Dep. of Macey Alderman 11:11–19, Mar. 14, 2024 [ECF No. 31-4].) Another co-worker, Jenna-Lee Vargas, testified that Poe "always treated [Ayers] differently," seemingly because he was a "free bird," and that Ayers was talked to about holding children when Vargas was not reprimanded—or even approached—for the same conduct. (Dep. of Jenna-Lee Vargas 11–15, Mar. 14, 2024 [ECF No. 31-10].) Further, Vargas testified that Poe wasn't "really for" gay people, and that she acted differently towards LGBTQ people as compared to heterosexual people. (*See id.*)

Ayers's own testimony also recounts how Poe disciplined him for inquiring about sexual orientation in the workplace but ignored any of his subsequent complaints about others asking him similar questions. (*See* Ayers Dep. at 73–75.) These incidents included Ayers asking a team lead if she was married or had a wife, after hearing she was gay from another co-worker, and asking another co-worker if her minor brother was gay.  (*See id.* at 65–66, 70–72.) Ayers also contends that Poe's comment about how Ayers's conduct with children could be viewed as "sexual harassment" is proof of a discriminatory stereotype against LGBTQ individuals.

(*See id.* at 81.) While the evidence of discrimination based on his sexual orientation is on shakier ground than his disability discrimination claim, it is sufficient to establish a *prima facie* case at this stage.

Assuming that Ayers can make a *prima facie* case of Title VII discrimination, Walmart offers a legitimate, non-discriminatory explanation for terminating him, namely that he refused to do a task asked of him and was already past the highest level of disciplinary action based on previous incidents. Therefore, the burden rests again with Ayers to demonstrate pretext.

Religious or other beliefs that evoke a personal animus toward Ayers's protected class are normally not enough to sustain a claim that he was terminated because of discrimination based on sexual orientation. *See Sarco*, 2022 WL 883936, at *9. Moreover, it appears that Ayers himself was culpable in promoting a harassing environment based on his comments about other employees' sexual orientation. (*See, e.g.*, Anders Dep. at 13:13–14:3.) But the court is not prepared to say that Ayers has failed to cite to any evidence to demonstrate pretext and support his claim. Ayers need only show evidence that the alleged explanation is "unworthy of credence" or that is sufficiently probative of sexual orientation discrimination. *Kennedy v. Abbott Lab., Inc.*, 654 F. Supp. 3d 512, 520 (E.D.N.C. 2023). As with his disability claim, the arguable inconsistencies in the reasons given for terminating Ayers, the inconsistent enforcement of policies, previous tense encounters with Poe, and other employees' testimony could lead a rational juror to conclude that Walmart's stated reasons for terminating Ayers were pretext to mask an unlawful motive. Accordingly, the court will deny Walmart's motion for summary judgment on Ayers's Title VII discrimination claim.

### 3. Count VIII: VHRA Discrimination

Under the VHRA it is an "unlawful discriminatory practice" for an employer to "[f]ail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to such individual's compensation, terms, conditions, or privileges of employment because of such individual's . . . sexual orientation . . . [or] disability." Va. Code Ann. § 2.2-3905(B)(1)(a). As noted above, Ayers's VHRA state claims mirror their federal counterparts and are subject to the same standards. *See, e.g.*, *Washington*, 677 F. Supp. 3d at 394 n.4; *Lundberg v. Delta Response Team, LLC*, No. 3:23-cv-00042, 2024 WL 1676806, at *3 (W.D. Va. Apr. 18, 2024) (analyzing VHRA sexual orientation discrimination claim under the same framework as the Title VII claim). Therefore, the court adopts the same analysis as articulated above (*see supra* §§ B.1., B.2.) in Counts II and VI to analyze Ayers's VHRA discrimination claim. Accordingly, for the reasons explained above and because the VHRA encompasses discrimination claims based both on disability and sexual orientation, the court will deny Walmart's motion on Count VIII.

### C. Retaliation Claims—Count III: ADA; Count VII: Title VII; Count IX: VHRA

Ayers also brings claims of retaliation under the ADA, Title VII, and the VHRA. Under the ADA, "[n]o person shall discriminate against any individual because such individual . . . made a charge . . . under this chapter." 42 U.S.C. § 12203(a). Under Title VII, an employer may not retaliate against an employee because he "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Similarly, the VHRA language parallels Title VII, stating that it is "an unlawful discriminatory practice for . . . [a]n employer to discriminate against any employees . . . because such individual has opposed any practice made an unlawful discriminatory practice by this chapter." Va. Code Ann. § 2.2-

3905(B)(7). These statutes all prohibit essentially the same conduct—punishing an employee for opposing discriminatory conduct.

To establish a *prima facie* case of retaliation, Ayers "must prove (1) he engaged in protected conduct, (2) he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action."[8] *Moss*, 670 F. Supp. 3d at 363 (quoting *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012) (internal quotation marks omitted)). The parties do not dispute that Ayers suffered an adverse employment action.

### 1. Count III: ADA Retaliation

Walmart argues that Ayers has not sufficiently established that any of his conduct rises to the level of protected activity, and that Ayers has not demonstrated a causal link between his termination (or discipline) and any of his alleged protected activity. (Def.'s Br. at 22–24.) Ayers counters that he has, in fact, requested accommodations multiple times (which were denied), and that the temporal proximity between his requests and his Ethics reports, on the one hand, and his termination, on the other, is sufficient to demonstrate causation. (Pl.'s Br. Opp. at 21–23.)

#### i. Protected Activity

Ayers has presented enough evidence to establish a dispute of fact as to whether he engaged in a protected activity. A plaintiff has "clearly engaged in protected activity by submitting a request for an accommodation." *Jacobs*, 780 F.3d at 577. Even "voicing one's

---

[8] This court has previously examined ADA and Title VII retaliation claims under the same test. *See Moss*, F. Supp. 3d at 362–63. Because of the parallel language between Title VII and the VHRA, this court has repeatedly examined retaliation claims under those statutes with the same test as well. *See id.; Washington*, 677 F. Supp. 3d at 398. The parties do not dispute this in their briefing. Therefore, the court will evaluate all three retaliation claims under the same standard.

opinions" and complaints to management about suspected violations can constitute protected activity. *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015).

Walmart contends that the record conclusively shows Ayers never made any request for an accommodation. This is not the case. The record, when viewed in Ayers's favor, shows that he made multiple requests for accommodations relating to his different disabilities. (*See, e.g.*, Ayers Dep. at 59, 86:2–87:9, 96:16–21, 149:13–151:2.) Further, Walmart's own policy emphasizes that requests for accommodation may be verbal, may be requested at any time, and do not need to contain any magic words. (*See* Accommodation Policy.) Ayers spoke to his supervisors about his PTSD and Asperger's syndrome, and discussed his arm injury, its limitations, and his related request not to push carts. (*See, e.g.*, Ayers Dep. at 59, 77–78; Ethics Email; Poe Dep. at 17–19, 89–90.) Ayers also offers evidence that he requested a transfer of departments for his autism and requested not to work a certain register on account of his PTSD. Ayers's complaints to Ethics about his frustrations of not being accommodated could also be viewed as qualifying protected activity. Moreover, regardless of any previous requests, Ayers's discussion with Poe directly preceding his termination could easily be viewed as an accommodation request that was denied.[9] As such, a jury could conclude that Ayers engaged in protected activity by requesting accommodations or complaining about his management's disregard for his disabilities.

---

[9] Walmart raises an argument that Ayers's "inflammatory conduct" during (and arguably only *after*) his termination "so exceeded the bounds of decency" so as to disqualify the conduct from being protected activity. But again, Walmart just raises more disputed issues. Walmart does not allege that any of Ayers's previous complaints or purported requests were "inflammatory," nor can they. From the record, Ayers's request for an accommodation during his termination appeared to come before any anger or potentially insulting language. Therefore, the court does not find this argument persuasive.

### ii. Causation

Walmart also argues causation is lacking, but Ayers presents sufficient evidence that, taken as true, could persuade a jury that his termination was in retaliation for his complaints and requests related to his disabilities.

"To demonstrate a sufficient causal connection between a protected activity and an adverse employment action, a plaintiff is required to show that his 'protected activity was a but-for cause of the alleged adverse action by the employer.'" *Moss*, 670 F. Supp. 3d at 364 (quoting *Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)). Importantly, the Fourth Circuit has long recognized that close temporal proximity is sufficient to establish a disputed issue of fact as to causation. *See, e.g., Jacobs*, 780 F.3d at 579 (finding termination three weeks after a request for accommodation to be close temporal proximity); *Cole v. Family Dollar Stores of Md., Inc.*, 811 F. App'x 168, 174 (4th Cir. 2020); *Waag v. Sotera Defense Sols., Inc.*, 857 F.3d 179, 192 (4th Cir. 2017). "The existence of relevant facts alone, or together with temporal proximity, may be used to establish a causal connection between the protected activity and the adverse action." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 123 (4th Cir. 2021).

Ayers's evidence shows that he was terminated mere moments after requesting a physical accommodation and within weeks of making complaints of other discrimination and alleged mistreatment related to his disabilities. Walmart contends that a decisionmaker must be aware of the protected activity to demonstrate proper causation and strenuously argues that Poe was not previously aware of Ayers's disabilities or requests. (*See* Def.'s Br. at 24 (citing *Roberts*, 998 F.3d at 124).) But as the court has noted above, there is sufficient evidence at this stage that Poe *was* aware of Ayers's disabilities. In addition to his conversations with Poe,

Ayers testified that he and "several associates overheard" Craft and Poe discussing Ayers's reports against her, in which he noted his disabilities and allegations of discrimination. (Ayers Dep. at 99:22–101:3; *see* Ethics Email.) Poe also conceded in her deposition that Ayers discussed his disabilities and could have brought them up to her before.

But even if there was no evidence of her *prior* awareness, Walmart must admit that Poe became aware of Ayers's physical disability before she terminated him because she clearly discussed his disability and attendant medical documentation mere moments before she fired him. Therefore, given the testimonial evidence and close proximity between the requests and complaints and his termination, a reasonable jury could find that the causation element is satisfied and, as such, Ayers established a *prima facie* case of retaliation.

### iii.  *McDonnell Douglas* Framework

While Ayers has demonstrated a *prima facie* case of retaliation under the ADA, as with his discrimination claims, this court also considers whether he can survive summary judgment under *McDonnell Douglas. See Jacobs*, 780 F.3d at 578. Given a *prima facie* case, Walmart then has the burden to articulate a legitimate nonretaliatory reason for its actions. *Id.* If articulated, the burden shifts back to Ayers to show the proffered reason is pretext. *Id.*

Walmart satisfies its burden by stating that it terminated Ayers for failing to follow a supervisor's orders and his hostile attitude after having been formally disciplined on two prior occasions. (Def.'s Br. at 24.) But for the reasons stated above (*see supra* § B.1.iii.), the court finds that a reasonable jury could conclude Ayers has shown that Walmart's reason is pretextual. Accordingly, there are genuine issues of material fact regarding whether Walmart retaliated against Ayers because of his complaints and requests for accommodation for his

disabilities. Therefore, the court will deny Walmart's motion for summary judgment on Count III.

### 2.   Count VII: Title VII Retaliation

Unlike the ample evidence surrounding Walmart's alleged retaliation against Ayers related to his disabilities, there is less evidence related to his claim based on retaliation for reporting or opposing sexual-orientation discrimination. But viewing the record in the light most favorable to Ayers, the court finds there is still sufficient evidence to support his *prima facie* case.

Ayers contends that he engaged in protected activity when he submitted his complaints to Walmart Ethics related to discrimination based on his sexual orientation. Both Ayers's email to Ethics and his later, pre-termination report through the online portal demonstrate that Ayers submitted complaints about alleged discrimination based on his sexuality. (*See* Ethics Email; Online Portal Complaints.) And as with his ADA claim, the temporal proximity of a few weeks between those complaints and his termination is sufficient to establish causation. Therefore, Ayers can establish a *prima facie* case of retaliation under Title VII.

Walmart reiterates its arguments that it had a legitimate reason to terminate Ayers for his refusal to work as instructed. And indeed, Ayers's post-termination complaint to the Ethics online portal makes no mention of an accusation that the termination had anything to do with his sexual orientation or his complaints about potential discrimination on that basis. (*See* Online Portal Complaints.) But as explained above (*see supra* § B.2.ii., C.1.iii.), Ayers has provided enough evidence in the record to present this issue to a jury. Accordingly, Walmart's motion for summary judgment will be denied with respect to Count VII.

### 3.   Count IX: VHRA Retaliation

Once again, Ayers's VHRA state claims mirror their federal counterparts and are subject to the same standards. *See, e.g.*, *Washington*, 677 F. Supp. 3d at 394 n.4. Therefore, the court adopts the same analysis as articulated above (*see supra* §§ C.1., C.2.) to decide the VHRA retaliation claim. Accordingly, for the reasons detailed above and because the VHRA encompasses retaliation claims based both on disability and sexual orientation discrimination (*see supra* § B.3.), the court will deny Walmart's motion on Count IX.

### D. Count IV: Failure to Accommodate

Ayers next brings a failure-to-accommodate claim under the ADA. To establish a *prima facie* case for failure to accommodate, he must show that: (1) he has a qualifying disability under 29 U.S.C. § 705(20); (2) Walmart had notice of his disability; (3) he could perform the essential functions of his job with a reasonable accommodation; and (4) Walmart refused to make any reasonable accommodation. *Lanir v. Yorktown Sys. Grp., Inc.*, 527 F. Supp. 3d 817, 821 (E.D. Va. 2021); *see Jacobs*, 780 F.3d at 579. The ADA imposes a duty on employers to engage in an interactive process, which "is generally triggered when an employee communicates to his employer his disability and his desire for an accommodation for that disability." *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 346–47 (4th Cir. 2013). "If a plaintiff establishes a *prima facie* case for failure to accommodate, a defendant nonetheless avoids liability under the ADA if it can show as a matter of law that the proposed accommodation will cause undue hardship in the particular circumstances." *Lanir*, 527 F. Supp. 3d at 821 (quoting *Reyazuddin v. Montgomery County, Md.*, 789 F.3d 407, 414 (4th Cir. 2015)) (cleaned up).

Walmart primarily argues that there is no evidence that Ayers provided proper notice of his disability or submitted any accommodation request to Walmart.[10] This is belied by the record. There is evidence that Walmart had notice of Ayers's disabilities and that it refused to make a reasonable accommodation or engage in an interactive process after his requests. For one, Ayers testified that he told Poe—and many others—that he had PTSD and autism when asked whether he had disabilities (Ayers Dep. at 77:13–18), and that he had a meeting with Poe and Craft to discuss his Asperger's. (*See* Poe Dep. at 17:16–18:5.) Further, there is a plethora of evidence in Ayers's favor that Poe and others at Walmart knew of Ayers's arm injury. (*See, e.g.*, Poe Dep. at 37:13, 89:19–20, 89:22–90:2.) Based on Walmart's policy (*see* Accommodation Policy) and Poe's own understanding, an accommodation may be requested at any time, without a magic word; the employee "would just need to make it known that they need the help in order to continue to do their job at a certain level." (Poe Dep. at 29:20–22.) Therefore, the account of Ayers's termination where he asked for a cart mule because of his arm injury is sufficient evidence to create a genuine dispute of fact about whether Ayers provided notice of his disability and requested an accommodation for it. (*See, e.g.*, Poe Dep. at 102:17–103:13; Ayers Dep. at 86:21–87:9; Dix Statement ("[H]e said he couldn't push carts without a mule because his elbow had been crushed and he had told her that previously. She asked if he had documentation he said that he would get it. She said it would need to be on file already.").)

---

[10] Walmart cites to two cases in support of this argument: *Yerby v. City of Richmond*, No. 3:19-cv-394, 2020 WL 1052519 (E.D. Va. Mar. 4, 2020), and *Callahan v. Prince William Cnty. Pub. Schs.*, No. 1:16-cv-00167, 2016 WL 7106394 (E.D. Va. Dec. 5, 2016). Both cases, as Ayers suggests, are distinguishable because they involve plaintiffs who did not dispute that they failed to request an accommodation or failed to comply with the accommodation process. The instant case presents facts that are disputed on these issues.

The parties also dispute when Ayers was diagnosed with Asperger's. (*See, e.g.*, Ayers Dep. at 150–51.) Ayers argues that he was diagnosed with Asperger's by at least mid-August, 2020, whereas Walmart insists that Ayers had no official diagnosis until approximately November 2021, after his first disciplinary coaching. The testimony and medical records submitted as part of the parties' briefs provide evidence to support both parties' views, so these factual questions, to the extent they are relevant, must go to a jury to resolve. For all these reasons, the court will deny Walmart's motion for summary judgment on Count IV.

### E. Count V: Interference

Finally, an employer may not "coerce, intimidate, threaten, or interfere with" an employee's efforts to exercise his rights under the ADA. *Kelly v. Town of Abingdon, Va.*, 90 F.4th 158, 171 (4th Cir. 2024); 42 U.S.C. § 12203(b).[11] To state a claim for ADA interference, a plaintiff must show: "(1) he engaged in activity statutorily protected by the ADA; (2) he was engaged in . . . the exercise or enjoyment of ADA protected rights; (3) the defendants coerced, threatened, intimidated, or interfered on account of his protected activity; and (4) the defendants were motivated by an intent to discriminate." *Kelly*, 90 F.4th at 171 (quoting *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550–51 (7th Cir. 2017)) (cleaned up). "The statutory term 'interfere with' is broader than retaliation, and captures 'all practices which have the effect of interfering with the exercise of rights' under the ADA." *Id.* (citing *Brown v. City of Tucson*, 336 F.3d 1181, 1191 (9th Cir. 2003)).

---

[11] The Fourth Circuit has "not yet interpreted § 12203(b)," but has followed the framework as adopted in *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550–51 (7th Cir. 2017). *Kelly*, 90 F.4th at 171. This court has done the same in the past. *See, e.g.*, *Sowers v. Bassett Furniture Indus., Inc.*, No. 4:19-cv-00039, 2021 WL 276169, at *9 (W.D. Va. Jan. 27, 2021).

Ayers's request for an accommodation qualifies as protected activity under the ADA. *See Sowers v. Bassett Furniture Indus., Inc.*, No. 4:19-cv-00039, 2021 WL 276169, at *9 (W.D. Va. Jan. 27, 2021); *Kelly v. Town of Abingdon, Va.*, No. 1:19-cv-00032, 2020 WL 2553614, at *7 (W.D. Va. May 20, 2020). He contends that Walmart's refusal to engage in dialogue concerning his accommodations, demanding immediate medical documentation, and denying his request, constitute interference with his ADA rights. EEOC's guidance on this issue, though not controlling, details examples of prohibited conduct, including: "coercing an individual to relinquish or forgo an accommodation to which he . . . is otherwise entitled," and "issuing a policy or requirement that purports to limit an employee's rights to invoke ADA protections." EEOC Enforcement Guidance on Retaliation and Related Issues, 2016 WL 4688886, at *26–27 (Aug. 25, 2016).

Here, Ayers offers evidence that Poe required him to push carts over his objections and risk further injury or face termination. (*See* Online Portal Complaints.) Moreover, testimony of Ayers and Poe and a statement by Dix raise the issue of Poe demanding that Ayers produce medical documentation immediately after a request for accommodation and refusing to engage in the accommodation process any further, limiting his ability to seek ADA protections. Walmart reiterates its argument that no evidence shows that Ayers ever requested an accommodation, but for the reasons previously discussed, there is evidence to create a factual dispute over whether Ayers requested such accommodation. Moreover, evidence of Poe's mishandling of the accommodation request and threatening termination if Ayers did not forgo his request for accommodation at that time could reasonably satisfy the interference element.

While it is true that courts do not endeavor to weigh the wisdom of employment decisions, *see, e.g.*, *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 901 (4th Cir. 2017), the record viewed in Ayers's favor could persuade a jury that Poe intended to discriminate against him when she dismissed his complaints and request related to his physical disability and terminated him in contravention of the proper process because of a dispute over his physical disability. Accordingly, the court finds that Ayers has presented sufficient evidence to present his interference claim to the jury and will deny Walmart's motion for summary judgment on Count V.

### IV.   CONCLUSION

For the foregoing reasons, Walmart's motion for summary judgment is **DENIED**.

The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 13th day of September, 2024.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE